Beatrice **REESE**, Individually and as Guardian for Carol Lynn Reese and Jennifer Ann Reese, Minor Children, and Eli Reese, Plaintiffs-Appellees,

v.

**MERCURY MARINE DIVISION OF BRUNSWICK CORPORATION,** Defendant-Appellant.

No. 85–2400.

United States Court of Appeals, Fifth Circuit.

July 11, 1986.

Rehearing and Rehearing En Banc Denied Aug. 7, 1986.

E. Grady Jolly, Circuit Judge, dissented and filed an opinion.

Arthur M. Glover, Jr., Jack M. McKinley, Houston, Tex., for defendant-appellant.

Seale, Stover, Coffield & Gatlin, March H. Coffield, Gary H. Gatlin, Jasper, Tex., for Beatrice Reese, et al.

Gilbert T. Adams, Jr., Beaumont, Tex., for Eli Reese.

Before BROWN, JOHNSON, and JOLLY, Circuit Judges.

JOHNSON, Circuit Judge:

Appellant, Mercury Marine Division of Brunswick Corporation (Mercury), appeals from a judgment in favor of the plaintiffs in this wrongful death action. Finding appellant's contentions on appeal to be without merit, we affirm the judgment of the district court.

## I.

Melvin Reese was fatally injured on May 7, 1983, in a boating accident on the Neches River. At the time of the accident, Reese was operating a fourteen foot "jon boat"

equipped with a twenty-five horsepower outboard motor manufactured by the defendant Mercury Marine. Reese had purchased the motor in May of 1982 from Hodge Boats and Motors in Beaumont, Texas.

The accident occurred while Reese was on a fishing trip with his family and friends. Reese and a companion, John Burrell, were proceeding down the Neches River when their boat hit a snag. Reese and Burrell were both thrown into the water. The unmanned boat turned in the river and circled back toward Reese and Burrell. Reese pushed Burrell under the water to avoid the boat. When Burrell resurfaced, Reese had disappeared. Reese's body was recovered from the river several days later. While the evidence regarding the precise cause of Reese's death was conflicting, several witnesses indicated that Reese was killed when struck by the unmanned boat.

Reese's survivors filed the instant wrongful death action against the manufacturer of the boat's motor, Mercury Marine. Plaintiffs pursued two separate strict products liability theories. According to plaintiffs, Mercury's outboard motor was defectively designed because it was not equipped with a safety device known as a "kill switch." A kill switch is a device designed to stop or slow the outboard motor operation when the boat operator is thrown or ejected from the operating position. Plaintiffs argued that any outboard motor lacking a kill switch is unreasonably dangerous because of the circling phenomenon—the tendency of an unmanned boat powered by an outboard motor to circle. Plaintiffs argued that had Reese's outboard motor been equipped with a kill switch, Reese would not have been fatally injured by the circling boat.

Plaintiffs also asserted that the Mercury motor was defective and unreasonably dangerous because it was not accompanied by warnings and instructions informing the user of both the circling phenomenon and the availability of a kill switch. According to plaintiffs, Mercury's failure to provide

such a warning was a producing cause of Reese's death.

After an intensely contested three day trial, the jury returned a verdict partially in favor of the plaintiffs. The jury concluded that Mercury's failure to equip the outboard motor with a kill switch did not render the product defective and unreasonably dangerous. The jury also concluded, however, that Mercury had failed to adequately warn consumers of the benefits of kill switch use and that such failure rendered the outboard motor unreasonably dangerous. In addition, the jury attributed twenty-five percent of the fault for the accident to Melvin Reese. After the district court entered judgment in favor of plaintiffs, Mercury filed a timely notice of appeal.

On appeal, Mercury asserts several challenges to the district court's conduct of the trial proceedings. In particular, Mercury contends (1) that the district court erred in excluding relevant evidence regarding the retailer's responsibility to warn consumers regarding kill switch use; (2) that the district court committed reversible error by repeatedly and adversely commenting upon the behavior and motives of Mercury and its attorney; (3) that the district court erred in admitting evidence of remedial measures adopted by Mercury following Reese's accident; and (4) that Mercury is entitled to a new trial based on a "conscience of the community" argument made by plaintiffs' attorney during closing arguments. Mercury does not challenge the amount of damages awarded by the jury. For the following reasons, we find Mercury's various contentions to be without merit.

## II.

Mercury first contends that the district court erroneously excluded evidence relevant to determining the adequacy of Mercury's warnings regarding kill switch use. In particular, Mercury challenges the district court's exclusion of evidence contained in the depositions of David Williams and Charles Anglin regarding the dealer's role in instructing customers about kill switch

use. Mercury attempted to introduce the following deposition testimony of Williams, the general manager of Hodge Boats and Motors:

Q: Now you recognize when you sell an engine that you have certain responsibilities and that the operator has certain responsibilities; is that correct?

A: That's correct.

Record Vol. III at 676. Mercury also attempted to introduce the following deposition testimony of Anglin, the salesman who sold Reese the motor involved in the instant case:

Q: Now, are you familiar with the Mercury Marine manual that goes with various outboards?

A: Yes sir.

Q: And in the manual does it have a section that says 'Dealers Responsibility and Owners Responsibility?'

A: Yes sir.

. . . . .

Q: And one of your responsibilities is to tell him [the purchaser] about the various equipment you can buy with that engine.

A: Right.

. . . . .

Q: All right. Would you tell us whether or not one of the dealer's responsibilities is to see that the engine-boat combination are properly equipped?

A: Yes, sir.

Record Vol. III at 681–84.

■ The district court properly determined that the foregoing evidence was immaterial to the issue of causation. Texas law places liability on the manufacturer of a defective product if the defect is a "producing cause" of the plaintiff's injury. More than one producing cause can exist for any particular injury. *Ragsdale Brothers, Inc. v. Magro*, 693 S.W.2d 530, 538 (Tex.App.—San Antonio 1985). Where both a product manufacturer and a third-party owe independent duties to warn consumers regarding a product "defect," the third party's failure to warn is not a defense to the manufacturer's failure to warn. Similarly, where a manufacturer attempts to fulfill its duty to warn through a third-party intermediary, that third-party's negligence does not break the causal connection between a breach of the manufacturer's duty and the ultimate user's injury.[1]

On appeal, Mercury does not challenge the district court's conclusion that evidence regarding the dealer's responsibility to instruct customers was not material to the issue of causation. Rather, Mercury contends that the excluded evidence should have been admitted as relevant to determining the adequacy of steps taken by Mercury to instruct and warn ultimate consumers.[2] Mercury concludes that the district court's ruling excluding evidence regarding dealer responsibility was reversible error entitling Mercury to a new trial.

---

**1.** A cause of action in strict liability for failure to warn is comprised of five essential elements: (1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product; (2) a reasonably foreseeable or actually foreseen risk of harm at the time the product is marketed; (3) a failure to provide any warning of the danger or a failure to provide an adequate warning (or instructions) of the danger; (4) the absence of the warning (or instruction) must render the product unreasonably dangerous; and (5) the failure to warn (or instruct) must constitute a causative nexus in the product user's injury. Sales, *The Duty to Warn and Instruct for Safe Use in Strict Tort Liability*, 13 *St. Mary's L.J.*, 521, 524 (1982). While a third-party intermediary's failure to communicate a warning does not break the causal connection between a breach

of the manufacturer's duty and the customer's injury, such a failure may be relevant in determining whether the manufacturer has provided an adequate warning. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1091 (5th Cir.1973).

**2.** Several authorities support Mercury's contention that in some circumstances, a manufacturer can satisfy its duty to warn by warnings made through intermediaries which are reasonably calculated to reach ultimate purchasers. *See Shop Rite Foods v. Upjohn Co.*, 619 S.W.2d 574 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r. e.); *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); Restatement (Second) of Torts § 388.

For several reasons, we disagree. First, in asserting objections to a trial court's exclusion of evidence, a party is required under Fed.R.Evid. 103(a)(2) to carefully articulate every ground for which the evidence is admissible. *Huff v. White Motor Corp.*, 609 F.2d 286, 290 n. 2 (7th Cir.1979); *United States v. Edwards*, 696 F.2d 1277, 1281 (11th Cir.), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983); 1 *J. Weinstein & M. Berger, Weinstein's Evidence* ¶ 103[03] at 103–31 to 103–32 (1985); *see also United States v. Garcia*, 531 F.2d 1303, 1307 (5th Cir.), *cert. denied*, 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976). Failure to do so renders the district court's ruling reversible only upon a finding of plain error. The rationale supporting this requirement is clear. Busy trial courts should not be required to repeat trials, especially civil trials, because the trial judge has excluded evidence for lack of a clear understanding of the proponent's purpose in offering the evidence. The trial judge must be put on notice of the purpose for which the evidence is offered while there is still time to remedy the situation. It is the proponent's duty, not that of the trial court, to clearly articulate the purpose for which the evidence is offered. *Robbins v. Whelan*, 653 F.2d 47, 53 (1st Cir.) (Campbell, J. dissenting), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981).

In the instant case, Mercury never clearly articulated that it was offering the excluded evidence to show the adequacy of its warnings to inform ultimate consumers regarding kill switch use. Rather, Mercury repeatedly and consistently emphasized that it was seeking to introduce evidence of dealer negligence to establish a break in the causal chain between Mercury's failure to warn and Reese's accident. In response to the district court's exclusion of Mercury's evidence, the following dialogue occurred:

The Court: The objection will be sustained. There is no question about that. The Court had already reprimanded Counsel about attempting to go into the responsibility of the dealer. The dealer is not being sued.

Counsel: Your Honor, I have pleadings on file where I have pled the negligence of third-parties over whom we have no control, which includes the dealer.

The Court: The negligence of the third-party is no defense to the Defendants in this case.

. . . . .

Counsel: It could go to the issue of causation, Your Honor.

The Court: It does not go to the issue of causation and the Court would so state. Now you may have your objections if you want to, but the Court is not going to permit it.

Counsel: Well, for the record I would like to state that . . . [w]e have pleadings on file, pleading negligence of the third-party and we would offer evidence of negligence of third-party to show that there is a reasonable causation.

. . . . .

The Court: [A]ny negligence on the part of the dealer does not work as a defense to the manufacturer and does not in any way effect [sic] the liability of the manufacturer.

Counsel: I would like to make an additional comment in the record that the offer is for . . . the purpose of showing, since we already have evidence and since the manufacturer never has contact with the customer, but it is the dealer who has the responsibility of having contact with the customer. And that the only way Mercury can in fact get instructions from itself to its customers is through its dealer and therefore they have set up dealer responsibilities and matters over which the dealers have a duty to advise the customer.

. . . . .

The Court: But the dealer is not sued in this case and the manufacturer, which is your company, that you represent,

cannot defend upon the negligence of the dealer. Now the dealer may also have responsibilities and should have warned the Plaintiff, but that doesn't help [Mercury] any.

Counsel: It goes to causation, Your Honor.

The Court: Well it doesn't help you. The Court has heard enough and I will not permit any more of this deposition at this time.

Record Vol. III at 490–95.

The district court's remarks clearly indicate that the court did not understand Mercury to be offering the evidence regarding dealer responsibility on any issue other than causation. This understanding was reasonable given Mercury's repeated assertion that the evidence "goes to causation." While at one point in the dialogue Mercury hints that the evidence was relevant to the adequacy of Mercury's efforts to warn ultimate consumers, Mercury immediately thereafter reasserted its causation theory. Thus, our painstaking and thorough review of the record fails to reveal that the trial court's attention was ever reasonably called to Mercury's now asserted theory of relevance.[3]

■ Even were we to conclude otherwise, Mercury would not be entitled to a new trial based on the trial court's exclusion of evidence regarding dealership responsibility. An adequate warning must be reasonably calculated to reach the ultimate user of a product. Such a warning must also convey a fair indication of the nature and extent of the danger. *Lopez v. ARO Corp.*, 584 S.W.2d 333, 336 (Tex.Civ. App.—San Antonio 1979, writ ref'd n.r.e.). The only evidence excluded by the district court even remotely suggesting Mercury's efforts to warn simply established that Mercury's operation and maintenance manual required dealers to make sure boats were "properly equipped."[4] No evidence suggests that Mercury directed its dealers to inform customers specifically regarding "kill switch" use. In fact, David Williams, the general store manager of Hodge Boats and Motors, stated during his deposition that Mercury had never even explained to him the reasons for its manufacture of a lanyard-type kill switch. Deposition of David Williams at 47.[5]

■ The only other evidence cited of Mercury's attempts to instruct users regarding kill switch use is evidence indicating that Mercury manufactured kill switches and supplied them to retailers. There is also evidence in the record indicating that the dealer in question in the instant case had a general knowledge of the pros and cons of kill switch use.[6] On the

3. As further evidence of the basis for Mercury's trial objection, Mercury's motion for a new trial asserted the admissibility of the evidence only on the issue of causation. Specifically, Mercury stated that the district court erred "[b]y excluding evidence offered by Defendant Mercury Marine on the dealer-third-party negligence as an intervening or superseding cause of Plaintiff's injuries." Record Vol. I at 188. Mercury also stated that the district court erred "[b]y charging the jury not to consider the third-party negligence of the dealer on any issue in the case, which charge to the jury unfairly prejudiced Defendant Mercury Marine's defense as to proximate and/or producing cause." Record Vol. I at 190.

4. We note that the manual containing the statement regarding dealer responsibility to ensure that boats are properly equipped was admitted into evidence as Plaintiffs' Exhibit No. 8. During closing argument, Mercury fully detailed the significance of the dealer's responsibility and

the dealer's superior position to warn consumers. Record Vol. III at 932.

5. In its brief, Mercury asserts that Williams would have testified at trial via deposition "that part of that equipment for which a dealer had responsibility is the after-market kill switch device available for use with the outboard motor in question." Our review of Williams' deposition reveals no such testimony.

6. Mercury also presented evidence suggesting that the dealer was in a superior position to warn customers. This evidence, while relevant to determining whether an indirect warning was appropriate, fails to detail the steps taken by Mercury to provide such a warning.

In its brief, Mercury suggests, citing the deposition of David Williams, that it supplied relevant safety information to the dealers involved in this case through seminars and product information bulletins. However, William's testimony does *not* reveal any information provided by

other hand, overwhelming trial court evidence indicated that a direct, specific warning regarding kill switch use was both feasible and practical. Given the paucity of evidence suggesting that Mercury's efforts to warn consumers were adequate and Mercury's failure to reasonably articulate before the district court the relevance of the excluded "dealer responsibility" evidence, we must conclude that Mercury is not entitled to a new trial based on this exclusion.

### III.

Mercury also contends that the district court made highly inflammatory and prejudicial comments in front of the jury entitling Mercury to a new trial. In its brief, Mercury points to numerous remarks made during the course of trial. In evaluating the effect of the district court's remarks, this Court considers the record as a whole, not merely isolated comments. *See Newman v. A.E. Staley Manufacturing Co.*, 648 F.2d 330, 334–35 (5th Cir.1981).

█ The conduct of the trial judge must be measured by a standard of fairness and impartiality. *Nordmann v. National Hotel Co.*, 425 F.2d 1103, 1109 (5th Cir.1970). Thus, the district court's conduct toward plaintiffs is relevant in evaluating Mercury's claim of prejudice. We further note that the role of a federal judge is not that of a mere moderator. *Posey v. United States*, 416 F.2d 545, 555 (5th Cir.1969). The judge presiding over a trial has a responsibility to conduct an orderly trial. In carrying out this responsibility, the trial judge is empowered to keep a case moving within the bounds of reason. *Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir. 1985). "Continued questioning on matters covered in detail or on irrelevant matters may require a judicial admonition of counsel." *Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 857 (5th Cir.), *cert. denied*, 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1973).

When a timely objection is made at trial, we must determine whether the remarks impaired a substantial right of the objecting party. *Newman v. A.E. Staley Manufacturing Co.*, 648 F.2d 330, 335 (5th Cir. 1981). While the failure to make timely objection does not preclude appellate review, such failure does limit our review to review for plain error. *Dixon v. International Harvester Co.*, 754 F.2d 573, 585 (5th Cir.1985).

Counsel for Mercury did object at trial to several comments of the district court now challenged on appeal. In particular, Mercury objected to those comments made by the district court during a heated discussion with Mercury's trial counsel on the admissibility of evidence regarding the dealer's responsibility to warn. Early on in the trial, during Mercury's opening statement, the district court had indicated that evidence regarding the dealer's responsibility to warn was not admissible to show the existence of an intervening cause. Record Vol. II at 16–17. Later, during the testimony of a technical representative for Mercury Marine, the district court again indicated that it would not allow testimony regarding the dealer's responsibility to warn consumers for the same reason. Record Vol. II at 469–70. Shortly thereafter, Mercury sought to introduce additional evidence of the dealer's responsibility to instruct consumers about kill switches. The district court's initial response to Mercury's offer was to simply sustain plaintiffs' objection and state: "The negligence of the third-party is no defense to the Defendants in this case." Record Vol. III at 490.

Counsel for Mercury nevertheless continued to press its position that the dealer's negligence was relevant to causation. Record Vol. III at 492. At this point, the district court became obviously concerned about the effect on the jury of Mercury's continuing assertions of a spurious defense. The following dialogue ensued:

Mercury specifically regarding kill switch use or the circling phenomenon. Williams also testified that the Mercury safety seminars addressed primarily "safety and repair of the motor and not so much its operation." Deposition of David Williams at 39–41.

The Court: Are you wanting a mistrial of this case, is that what you are wanting?

Counsel: No, Sir, I certainly don't want a mistrial of the case.

.        .        .        .        .

The Court: Well, if you make that objection then you put the Court in a position where we might have to declare a mistrial.

Counsel: Your Honor, I have to make the objection and I apologize that I have to make the objection.

The Court: Well, your apology doesn't mean anything to me. It is not sincere in the least, in the Court's opinion. Now if you just want to continue on as you are doing, the Court will have no alternative but except to declare a mistrial.

Record Vol. III at 492–93. In spite of this admonition, Mercury's counsel persisted in asserting the admissibility of its offer of proof. A brief time thereafter additional dialogue ensued with the district court at one point stating that Mercury's "Counsel will not play by the rules." Record Vol. III at 495. Eventually, the district court excused the jury and stated:

I think we're going too far. I think the Court's going to have to declare a mistrial in this case. We will excuse the jury until 9:00 o'clock tomorrow morning, and we will have a definite announcement for you at that time.

Record Vol. III at 501.

After the jury had been excused, the district court met with the attorneys involved in the trial and indicated that the jury might have been unduly prejudiced by the arguments of Mercury's counsel. Noting that trial had already gone on for two days, the district court asked each attorney for his view on the need for a mistrial. The court indicated that if either the plaintiffs or the defendant asked for a mistrial the request would be granted or considered. Record Vol. III at 503. All parties thereafter agreed to go forward with the trial. Record Vol. III at 509–10. Immediately after agreeing to go forward

with the trial, however, counsel for Mercury stated for the record that because of the prejudicial comments of the court, it was moving for a mistrial. Record Vol. III at 514. The district court denied Mercury's motion.

The following day, the district court made the following statement to the jury:

You will recall that Counsel for the Defendant, Mr. Glover, attempted to offer certain testimony concerning the fault or negligence of a third party, the third party being the agency or agency that sold the motor to the Plaintiff. You will recall that the Court stopped the attorney, advising him that this was not an issue for the Jury to decide, and regardless of any fault or negligence on the part of the third party, namely the agency that sold the motor would not be a defense to the Plaintiffs' claim against the manufacturer. Now while the agency might have some liability and the Plaintiff might have sued the agency, this is not for the Jury's concern because these facts do not exist. The Plaintiff chose to sue the manufacturer and any fault on the part of the agency cannot be relied upon as a defense on the part of the manufacturer, which Mr. Glover represents, the Mercury Company.

So you will follow the instructions of the Court and not give that any consideration or any weight or let it affect you in determining the liability, if any, that exists on the Defendant which the Plaintiff asserts in his claim for the strict liability or products liability based on the defect in the design of the motor in question and the failure to give an adequate warning.

Now you will recall that in the trial of the case the situation got a little heated in that the Court was of the opinion that Mr. Glover disagreed with the Court and contended that such evidence was a defense to his client, the Defendant. In other words the Court construed that this was arguing with the Court's ruling and Mr. Glover, as he should have done and as he did do, said that he was repre-

senting his client as the best he could and that he had a right to take an exception to the Court's ruling, which he did. And then this precipitated some comments by the Court concerning Mr. Glover's tactics in his effort to show liability on the part of someone else as a defense to the liability of the client that he represented. And the Court felt that this was misleading and would be misunderstood by the Jury and would in some way deceive the Jury. Now the Court will say further that Mr. Glover has a right to represent his client in any way that he feels he is justified in doing so, staying within the bounds of the rules of procedure and the rules of propriety. On the other hand the Court also has the responsibility of presiding over the Court and trial, the trial of a case and attempting to see that the evidence is fairly presented to the Jury both from the Plaintiffs' standpoint and the Defendant's standpoint. The Court can, in the heat of discussions, as was present yesterday, can be indiscrete and we do not think that perhaps under the circumstances we were indiscrete we feel that it was precipitated and caused by Mr. Glover's actions.

But the Court wishes to advise the Jury that you are not to give any consideration and will remove from your mind any thought that you might have concerning the discussions and the comments made by the Court, or the comments made by Mr. Glover concerning that matter. The Court certainly meant nothing personal and the Court has no hostility towards Mr. Glover. We want him to present his case in the manner in which he wants to. But we feel that if he exceeds the bounds of propriety, then we must interfere and make the rulings that we feel are necessary to make to assure a fair trial to all parties. So please do not let the fact that you feel that the Court became irritated or was intemperate and any comments that were made affect or influence you in your verdict either for or against the Defendant, or for or against the Plaintiffs. In other words, you will just forget that it happened and we will begin over and the Court will give you further instructions in regard to the duty and the obligations of the parties at the time we instruct the jury.

But I did want to explain these details so that you could remove from your mind any feelings that you might have that the Court holds any hostility against the Defendant or his attorney, Mr. Glover, because we do not. And we feel that he is doing an excellent job in the representation of his client.

Record Vol. III at 518–23.

Later, in instructing the jury, the district court stated:

Now further the Court would also instruct the jury that during the trial of the case it is necessary for the Court to sometimes reprimand counsel because we feel it is necessary to move the case along and because of some dilatory tactics or violation of the Rules of Evidence. And the Court would instruct the Jury that should not give that any consideration or let it affect your verdict in any way and the Court does not have any ill will towards any of the Counsel in this case. We have nothing but the finest feelings, so please bear in mind that any situation that might have occurred that gave you the impression that the Court was irritated or unhappy about the proceedings, do not let that affect you or influence your verdict in any way.

Record Vol. III at 1016.

Several factors persuade us that the district court's remarks during the foregoing exchange with Mercury's counsel did not "impair Mercury's substantial rights." First, the district court's admonition of counsel occurred only after repeated attempts by counsel to assert an objection already fully considered and ruled upon by the district court. It is well recognized that continued questioning on irrelevant matters may require a judicial admonition of counsel. *See Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 857 (5th Cir.), *cert. denied*, 414 U.S. 871, 94 S.Ct. 93, 38

L.Ed.2d 89 (1973). Thus, the comments made by the district court were in furtherance of its responsibility to "keep the trial moving." Moreover, counsel for Mercury declined to request a mistrial in response to the district court's offer to consider or grant such a request. Finally, while some of the district court's comments went further than necessary to expedite the trial, the court on two occasions specifically and carefully instructed the jury not to allow such comments to influence their verdict. Considering this instruction as well as defense counsel's conduct at trial, the district court's remarks do not entitle Mercury to a new trial.[7]

Mercury also challenges on appeal several remarks by the district court that were not objected to at trial. Our review of these remarks, therefore, is limited to plain error. Several of the remarks came in response to Mercury's cross-examination of John Burrell regarding the speed of the boat at the time of Reese's accident. At one point, the district court apparently stated that any damned fool would know the answer to Mercury's inquiry.[8] At another point, the district court intervened as Mercury's counsel introduced deposition testimony regarding the nature of Reese's injuries. The witness had testified in response to five separate inquiries that he had not carefully examined Reese's body and had

no recollection or knowledge of the severity of Reese's injuries. As Mercury's counsel continued to question the witness regarding the witnesses' recollection of the injuries, the district court intervened and reprimanded counsel for continuing to question the witness on matters already covered in detail and for introducing argument in the form of questions. Despite this reprimand, Mercury's counsel immediately resumed questioning regarding the witnesses' recollection of the injuries. The district court again intervened and stated that the court did not "appreciate [counsel's] conduct in regard to insisting on this type of testimony" and that counsel was not "giving the jury any information by which they can make a fact finding as to the injuries that [Reese] had on his head." Record Vol. II at 375–81.

Under the plain error rule (and Mercury does not contest the applicability of the plain error standard to those district court remarks which were not objected to) we conclude that the district court's comments were not so prejudicial as to deny Mercury an opportunity for a fair and impartial trial. The district court's conduct was directed towards expediting the trial by discouraging continued questioning on matters that were either patently obvious or which had been already covered in de-

---

**7.** By no means do we suggest that curative instructions such as those offered by the district court in the instant case will always suffice to dispel the prejudicial effects of improper judicial remarks. Given the particular circumstances here, however, such instructions are a factor in our decision to deny Mercury's request for a new trial.

No serious claim can be made that our conclusion in the instant case is in any way inconsistent with *Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir.1985). First, the Court in *Dartez* never reached the issue of whether the district court's comments were sufficiently prejudicial to require a new trial. The Court stated that "[b]ecause a retrial is required by our evidentiary rulings, it is not necessary to resolve this issue." *Id.* at 473. Moreover, as noted above, the district court's curative instructions in the instant case were only one (and perhaps the least significant) of several factors which compel us to conclude that the district court's remarks do not entitle Mercury to a new trial. Finally, we note that examining the effect of a

district judge's comments during a trial is a highly fact specific inquiry with the outcome turning on the precise nature of the comments in the particular case viewed in the context of that case.

**8.** Record Vol. II at 50. At the time of this incident, counsel for Mercury had asked Burrell a series of questions designed to get Burrell to admit that a boat would go "pretty fast" in the river current. Burrell had made a similar statement in an earlier deposition but could not recall the earlier statement during the trial. The district court became impatient with extensive cross-examination on a point the district court believed to be uncontested, unimportant and obvious. The record shows the district court's remark to be: "Any (expletive delete) would know that a boat went faster in the current." At oral argument, counsel for both plaintiffs and Mercury agreed as to the contents of the remark.

tail. *See Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 857 (5th Cir.), *cert. denied*, 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1973) (in response to questioning of a witness court stated that "any five year old idiot knows that."). In carrying out its responsibility to regulate the trial, the district court's conduct was at some points something short of exemplary. Our conclusion in the instant case by no means suggests blanket approval of that conduct. Rather, our conclusion reflects reluctance under the plain error standard to reverse a jury verdict arrived at after an extensive trial. We are especially reluctant given indications that the jury carefully and dispassionately weighed the evidence. We note in this regard that the jury rejected one of plaintiffs' two theories of liability and, in addition, found Melvin Reese to have been twenty-five percent contributorily negligent. We also note that many of the complained of remarks were prompted by the less than exemplary conduct of Mercury's trial counsel.[9]

The dissent focuses in great detail on what it concludes was an excessive damage award. Mercury has not challenged the size of the damage award on appeal and we decline to determine *sua sponte* the propriety of that award. We note, however, that the jury rejected expert testimony in support of far greater damages than those actually awarded.[10] That the jury did not calculate precisely the same numbers as the dissent in no way supports the dissent's conclusion that the jury was prejudiced by the district court's conduct.

## IV.

During trial, Reese successfully introduced into evidence, over Mercury's objection, a 1983 Mercury operation manual for the model of outboard motor involved in Reese's accident. This 1983 manual contained warnings and instructions regarding kill switch use. Prior operation manuals had contained no similar warnings. Mercury contends that because the motor involved in Reese's accident was manufactured in 1981 and sold in 1982, the 1983 operation manual was inadmissible evidence of a subsequent remedial measure under Fed.R.Evid. 407.

Rule 407 provides that:

9. The remaining remarks and evidentiary rulings complained of by Mercury similarly do not require a new trial. At one point, during Mercury's cross-examination of plaintiffs' expert witness regarding the utility of wearing a life jacket, the following colloquy occurred:

Q: It would keep you afloat, wouldn't it?
A: Well, it would prevent you from diving down to avoid it, but if you were struck it would keep you afloat. I agree.
Court: It could keep you afloat face down too.

Record Vol. II at 258. While such a comment was inappropriate, the effect of the comment during the course of a three day trial, and viewing the record as a whole, does not entitle Mercury to a new trial under the plain error standard. At the time of the foregoing colloquy, Mercury was pursuing a theory of contributory negligence. We note that the jury did in fact find that Melvin Reese was twenty-five percent contributorily negligent.

Mercury also cites the district court's reprimand of a witness for "trying to become an advocate." This reprimand occurred after the witness had volunteered evidence regarding the dealer's responsibility to warn. The district court noted that the information volunteered went beyond the scope of the question the witness had been asked. The district court also noted that it had already ruled that dealer responsibility evidence was inadmissible.

10. Plaintiffs' expert witness indicated the following figures as appropriate for each element of recovery: (1) $770,000 for lost earnings; (2) $287,000 for lost guidance and counsel (based on one hour each day for each of Reese's two daughters); (3) $64,000 for lost household services (based on ten hours of service each week); and (4) $6,704,000 for lost love and affection (based on all waking hours of each day and four individual beneficiaries of the lost love and affection). Although Mercury subjected the above testimony to strenuous cross-examination, Mercury failed to specify any alternate damage figures to assist the jury's determinations. During closing argument, plaintiffs' attorneys requested the jury to award the following amounts in damages: (1) Beatrice Reese, $2,500,000; (2) Carol Reese, $2,200,000; (3) Jennifer Reese, $2,300,000; and (4) Eli Reese, $500,000. The jury ultimately awarded the following amounts: (1) Beatrice Reese, $2,000,000; (2) Carol Reese, $425,000; (3) Jennifer Reese, $425,000; and (4) Eli Reese, $50,000. Thus, the jury actually awarded $4,600,000 less than the amount requested by plaintiffs.

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures *is not admissible to prove negligence or culpable conduct* in connection with the event. *This rule does not require the exclusion of evidence of* subsequent measures when offered for another purpose, such as proving ownership, control, or *feasibility* of precautionary measures, if *controverted,* or impeachment. (emphasis added)

In response to Mercury's Rule 407 objections at trial, the district court concluded that the 1983 operation manual was admissible to establish the feasibility of direct manufacturer warnings to customers. According to Mercury, however, the district court erred given that the feasibility of direct manufacturer warnings was never contested. We disagree.

Throughout the trial, Mercury asserted that given the many factors relevant to determining the desirability of kill switch use, the manufacturer was not appropriately situated to directly warn or instruct the ultimate consumer. For example, during its direct examination of Richard Snyder, Mercury elicited the following testimony:

Q: What things should you consider in determining whether or not you want to use a kill switch, you are going to or you are not going to?

A: I guess it would be repeating. You would consider the space within your boat as to how much room there is for people to walk around.

Q: All right, the style of the boat.

A: Yes, you consider the depth of the boat, the height of the gunnels and the sides of the boat. You would consider the speed that you intended to go. You would consider the type of water you intended to run in, things of that sort. Maybe I have named them all.

Q: Is there any way that Mercury, the manufacturer of this engine, can know the answer to all of those questions or any of those questions when they ship that engine out of their factory door?

A: No.

Record Vol. III at 602. *See also* Record Vol. II at 15–16, 239–40, 456. Similarly, during closing argument, Mercury's attorney stated:

Now the places where they [kill switches] are needed and they can be used on some boats, can only be found out really by one person and that is the dealer. These engines are manufactured and shipped out on trucks to different people, I mean different stores and different warehouses and the dealer sells the engine to the customer. The dealer should tell the customer what he has available, what options are there, and what use could be made of the engine and so forth. The dealer, when deposed, said he knew that and he said he recognized that he was the contact man and he said he understood what the kill switch was for, and he knew the pros and cons of it. Mercury had obviously gotten that information right down the tube and right to the place where it belonged, to the dealer, the only person who has contact with the customer. And this man knew all the answers and the pros and cons and he said he told people about it one hundred percent of the time as part of his sales pitch and he always tells them. He's the only person who can tell them. Mercury cannot tell them, Mercury is not out there selling this engine. If we had our own stores we could, but we don't. The dealer did not have one reason not to tell the truth. The dealer hasn't been sued and the salesman hasn't been sued and they are not in this litigation. They have got nothing to protect, and if they forgot to tell him or they didn't tell or sometimes he didn't say it, he has no reason at all to come in here and deceive anyone.

Record Vol. III at 932.

■■■■ Whether something is feasible relates not only to physical possibility, cost and convenience, but also to ultimate utility and success in intended performance. *Anderson v. Malloy,* 700 F.2d 1208, 1213 (8th Cir.1983); *see also American Airlines,*

*Inc. v. United States,* 418 F.2d 180, 196 (5th Cir.1969). Mercury's suggestion during trial that only the retailer could properly instruct the ultimate consumer regarding kill switch use clearly controverts the utility and likelihood of success of direct manufacturer warnings. Thus, the district court did not abuse its discretion in overruling Mercury's Rule 407 objection.

■ Mercury contends that even if not subject to exclusion under Rule 407, warnings contained in the 1983 manual should have been excluded under Rule 403 as unfairly prejudicial. Rule 403 provides that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Mercury's Rule 403 argument is unpersuasive. The warnings contained in the 1983 manual were highly relevant to establishing a material element in Reese's case against Mercury—the advisability and feasibility of direct manufacturer warnings to consumers. While the manual was certainly prejudicial to Mercury, given the manual's relevance, the district court's decision to permit introduction of the 1983 operation manual at trial was not an abuse of discretion.

## V.

Mercury's final contention on appeal is that during closing argument, counsel for plaintiffs made several remarks which amounted to an impermissible "conscience of the community" argument. At one point, plaintiffs' attorney mentioned Mercury's Wisconsin address. Record Vol. III at 976. At another point, plaintiffs' attorney referred to Mercury's expert witnesses as part of an act that goes around Texas and the nation defending kill switch cases. Record Vol. III at 966, 967. Plaintiffs'

attorney also observed that Reese "was so highly thought of in the community that they are still carrying on events in the City of Buna that are named in his memory." Record Vol. III at 980. Mercury contends that it is entitled to a new trial based on the foregoing statements.

Because Mercury failed to object at trial to the allegedly improper argument, this Court may reverse only if it finds "plain error." In civil cases, a finding of plain error is "confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Liner v. J.B. Talley and Co., Inc.,* 618 F.2d 327, 329–30 (5th Cir.1980). In applying the plain error standard, this Court has emphasized "our continued reluctance to address for the first time on review errors which the trial court was not given an opportunity to consider and correct ... [especially] when the errors assertedly lie in counsel's closing remarks." *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 286 (5th Cir.1975).

■ While this Court has condemned "community conscience" arguments as unfairly prejudicial, *see Westbrook v. General Tire & Rubber Co.,* 754 F.2d 1233, 1238–39 (5th Cir.1985), the comments cited by Mercury are not such as to require a new trial under the plain error rule. It is far from clear that the few isolated remarks cited by Mercury constituted an impermissible appeal to the conscience of the community. Nevertheless, an objection by Mercury and a precautionary instruction by the district court would have been clearly sufficient to remove whatever slight prejudice might have occurred.[11]

## VI.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

11. Mercury's closing was itself far from free of irrelevant and prejudicial argument. At one point Mercury's trial attorney compared his situation to that of Paul Newman in *The Verdict,* pointing out that he was alone against a team of lawyers on the other side. *See* Record Vol. III at 940. This was obviously an improper attempt to prejudice the jury by suggesting that he was the "little guy" struggling against great odds.

E. GRADY JOLLY, Circuit Judge, dissenting:

A fair trial is fundamental. This trial was not fair. Even from the cold record, the prejudicial impact of the district court's harsh statements and unwarranted interjections can be easily discerned: in this product liability death case, the jury returned a verdict of over $2 million in non-economic losses where there was no claim for punitive or pain and suffering damages. The bias against the defense exhibited by the judge throughout the trial was followed by a closing argument appealing to the jury's prejudices against out-of-state corporations that callously make widows and orphans of Texas women and children. Such a trial atmosphere goes far toward explaining the excessive and unjustifiably penal character of the award.

## I

The majority accurately cites some of the relevant portions of the trial transcript and accurately characterizes the standards we should use to evaluate the district court's comments. This dissent therefore stems not from any quarrel with those standards, but from the belief that when the record in this case is judged by those standards, the verdict and judgment in this case, as a matter of simple justice, cannot stand.

The difficulty with this case is that "although there is no indication that the district judge was in fact biased, the jury could have easily concluded that the judge favored plaintiff's position. A new trial is necessary." *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 336 (5th Cir.1981). The impression of bias results from a series of remarks that characterize the whole record, not just from isolated comments.

In order to understand that the remarks I reproduce here related to critical issues, it is necessary to briefly state the issues and contentions that the defendant raised at trial. Mercury attempted to show that its engine was not unreasonably dangerous for lack of a kill switch, because kill switches are poor safety devices that create more risks than they prevent, and because kill switches, which require the operator to attach himself to the engine by a cord, are so cumbersome to use that engine owners would never accept them. Mercury also attempted to show that Reese was negligent because he put a more powerful engine on his boat than it was rated for, and because he drove the boat too fast in dangerous waters. Mercury had also hoped to show that it was not liable for failing to warn consumers about the need for a kill switch, because that responsibility belonged to the dealer. Finally, Mercury's different theory about how the accident had happened seemed to suggest that the engine may not have struck Reese.

The first of the district court's improper remarks occurred early in the trial, during cross-examination of the only eye-witness. The defense counsel asked, "You will agree the boat would go pretty fast in the current?"

The district court commented that "any damned fool would know that a boat went faster in the current."

Defense counsel had not asked the only eyewitnesses if the boat would go *faster* in the current, but asked if it would go "pretty fast" in the current without the engine propelling it, suggesting that the engine may have been out of the water when the boat approached Reese. Defense counsel was attempting to impeach the testimony of the only eyewitness to the accident by using his prior deposition testimony. The witness avoided the question. Defense counsel may have been attempting to establish both that the boat was going "pretty fast" even though the engine may have been out of the water as the boat came back downstream, as a defense witness later testified, and that, in the interval before the boat returned, the eyewitness could not have seen all the events to which he testified because they would have happened too fast, as a defense witness later testified. Regardless of the value of that line of cross-examination, the district court injected itself into the case as a partisan. The district court not only cut off cross-examination of the only eyewitness on the cir-

cumstances of the accident, but by its deprecating remarks conveyed to the jury that the plaintiffs' version of the accident was as unquestionable as the fact that a boat goes faster in the current.

The district court next improperly added a comment that amounted to testimony for the plaintiffs. Defense counsel was suggesting by his cross-examination that Reese should have worn a life jacket because a life jacket would have kept him afloat. The trial judge, without any provocation, added his personal comment for all to hear: "It could keep you afloat face down, too." There was no evidence to this effect anywhere in the record. Can the majority deny that such a comment on the evidence by the dominant figure in the courtroom destroys the impartial atmosphere that the parties are entitled to demand in our federal courts? In this trial, a crucial element of the defense was that the failure to wear a life preserver indicated a careless indifference to safety. Yet the comment gave the impression that the impartial judge clearly and unmistakably felt that there was no value to this critical contention.

Later in the trial, the district court plainly demonstrated its sympathy for the plaintiff-widow. The district court cut off cross-examination of the widow, already a sympathetic figure, by twice observing that she should not be imposed upon by these "unnecessary" questions counsel was asking.

The judge next implied that the deposition testimony of the mortician that defense counsel had just offered was of no value. Defense counsel was attempting to show that if Reese had sustained a serious head wound from the boat or engine, the mortician would have seen and remembered it, but the mortician had testified that he did not remember seeing such a wound. The district court judge commented, "With him seeing bodies every day you expect he would remember." Defense counsel responded, "Are you asking me, Your Honor?" The judge added, *"I am making a statement."* Later, the district judge said to defense counsel, "I don't appreciate your conduct in regard to insisting on this type of testimony because I don't think you are giving the jury any information by which they can make a fact finding as to the injuries that the man had on his head." The district court's comments could hardly have been an attempt to move the trial along because they occurred *after* the defense had concluded its offer of the deposition. Instead, the district judge was injecting himself as a partisan, trying to devalue the mortician's testimony.

Later in the trial, the district court, *sua sponte,* suggested in the presence of the jury that a defense witness was offering his testimony for some ulterior purpose, and suggested further that the witness was becoming an advocate in the case. The district judge made his comment after the witness had begun to explain his answer on a voir dire conducted to determine whether a videotaped reenactment should be admitted. The court said, "Well, you were trying to become an advocate, in the Court's opinion. It makes the Court feel that you have a purpose in the manner in which you are testifying." Regardless of the evidentiary issue, the district court's reflections on the motives of the witness were unnecessary and certainly prejudicial to his credibility before the jury. Furthermore, it may well have appeared to the jury that the district court felt that Mercury's defense could not be viewed as a reasonably objective presentation of the facts.

Finally, in an exchange reproduced in the majority opinion, the district court questioned the sincerity of defense counsel after defense counsel apologized for possibly exceeding his proper bounds in attempting to introduce the issue of dealer responsibility. The district court correctly prevented the introduction of such evidence to expedite the trial. Nevertheless, by suggesting before the jury that counsel was insincere and was deliberately attempting to obtain a mistrial, the district court went beyond merely precluding the introduction of evidence.

Eventually even the district court felt that a curative instruction was necessary,

but the "curative" instruction, supposedly intended to remedy prejudice created by the district court's earlier comments, actually told the jury that the earlier comments were, in the light of defense counsel's conduct, justified. In the instruction which is reproduced in the majority opinion, the district court defended the propriety of its actions as a reaction to the allegedly improper conduct of defense counsel. These comments would have served a useful purpose had they been addressed to defense counsel *in camera*. Addressed to the jury, they merely undermined that part of the instruction that did attempt to cure the prejudice.

We have noted in *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 471–73 (5th Cir.1985), that the trial judge's comments are likely to carry a great deal of weight with the jury, and that he must therefore appear even-handed when he intervenes in a case. In *Dartez*, the same trial judge made remarks similar to those made in this case, remarks that the jury could have interpreted as reflecting negatively on defense counsel's abilities and motives. *Id.* at 473. As in this case, the judge apparently recognized that his remarks could have been prejudicial, and he gave essentially the same "curative" instruction that he gave here. In *Dartez*, we noted the ineffectiveness of the instruction:

> *Despite* the admonishment in the instruction at the close of the case, these comments could be interpreted by the jury as attributing an unwarranted degree of incompetence and obfuscation of issues to defense counsel that could weigh against accepting the defense offered on behalf of their clients. *Perhaps the recitation of these highlights will suffice to prevent any recurrence.* (Emphasis added.)

Thus the majority here is at odds with our previous panel's view that the similar instruction given here could eradicate the prejudice the judge's partisan and sometimes hostile remarks created.

Besides the "curative" instruction, the majority also relies on the fact that defense counsel did not object to several of these remarks. Even if it is fair to hold counsel to the "plain error" standard in this case, given their experience with the judge it is understandable that the defense attorneys were reluctant to object and have their case and their representation further subjected to the court's derision. Nevertheless, I believe that these remarks rise to the level of plain error.

Our circuit has required a new trial for remarks that were much less prejudicial than the remarks here. *Newman*, 648 F.2d at 335–36. In view of *Newman*, I am at a loss to see how the majority would deny a new trial on this record. The only possible difference by way of mitigation between this case and *Newman* is that the court here did make an effort to assuage the prejudice by an instruction. This instruction, however, was clearly ineffective, as the *Dartez* panel concluded with respect to a similar instruction.

In my opinion, the numerous remarks and interjections of the district judge against one party and in favor of another, taken as a whole, demonstrated a prejudicial trial atmosphere that denied the defendant the impartial judge that our system of justice guarantees. "The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." *Newman*, 648 F.2d at 334 (quoting *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)). I respectfully dissent from the majority's holding that it did not matter.

## II

The plaintiffs' closing argument reinforced the unfair prejudice to the defense created by the district court's comments. Although the comments of plaintiffs' counsel may not have been the most blatant "community conscience" appeal this circuit has ever had before it, they underscored the prejudice already created, and they further support the necessity of a new trial.

The plaintiffs' closing argument was emotional and parochial. Counsel for

Reese's father said of the family, "There is an empty chair in those folks' home and it is going to be empty for the rest of their lives, and that empty place in their heart that is going to be empty the rest of their lives because of [sic] a man was injured, not because he didn't have a life preserver on." Continuing in the same vein, he said, "And it wouldn't have mattered what he had on, and he could have had a raft tied to him and it wouldn't have mattered because when that boat came over him he was gone, and this lawyer won't tell you honestly what the facts are, but you have heard the evidence and...."

At this point, defense counsel objected to the statement that he would not state the facts honestly. The district court overruled the objection.

Counsel for Reese's father continued, referring to defense counsel's statement that he had only a few minutes to put together his closing argument.

Those guys are part of a dog and pony show that go around this State of Texas and go around this nation defending kill switch cases.... He knows every question he is going to ask everyone of those men [the defense witnesses] because they have rehearsed it and rehearsed it and rehearsed it.

And you have seen a production, Ladies and Gentlemen, and I want you to— You are going to decide this case and you are going to decide how many cases they are going to have to be presented around this country and how many widows there are going to be and how many orphans there are going to be and how many parents are going to lose their kids.

Defense counsel objected that this argument was outside the record, and the district court instructed the jury to ignore any arguments that went beyond the record.

Counsel for the rest of the Reese family did less to fan the prejudicial atmosphere, but he did make his contribution. First, he clearly pointed out that the designers of this engine all resided in Fond du Lac, Wisconsin, and asked rhetorically, "Where are they?" Then, he noted that Mercury had not advertised kill switches, nor, he claimed, advised customers about them even though one of the defense's experts used one every day. Instead, he argued, Mercury's response was,

And if an incident arose, get on the phone and get the expert team together and send them the depositions and they can read them while they are on the plane. That is what Mr. Langley told you, I got those depositions and I read them on the plane flying down. And we will send them to Austin and that is where one of them had them, and we will send them to San Antonio, and that is where another one had it, and we will send them to Beaumont, about this tragedy on the Neches River near the Evadale measuring station. And we will come up with something.

These arguments are similar to the "us-against-them" arguments condemned in *Hall v. Freese*, 735 F.2d 956, 960–62 (5th Cir.1984), and on which basis we reversed even though the defendant had not objected. They are improper "community conscience" arguments within the meaning of *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1238–39, *reh'g denied*, 760 F.2d 269 (5th Cir.1985), which said:

Our condemnation of a "community conscience" argument is not limited to the use of those specific words; it extends to all impassioned and prejudicial pleas intended to invoke a sense of community loyalty, duty and expectation. Such appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders.

I believe that, despite the defendant's failure to object, these arguments contributed to the substantial injustice done to the defendant and support reversal.

### III

The prejudicial impact of the district court's comments and the improper closing argument are clearly evident in the excessive verdict returned by the jury. At the

time of his death, Reese was thirty-eight years old and was earning $25,000. The jury awarded Reese's widow $2 million, Reese's daughters $425,000 each, and Reese's father $50,000. The total for the family is $3 million. The court then reduced the awards by the twenty-five percent of the fault the jury attributed to Reese. The $3 million award includes no punitive damages nor damages for pain and suffering.

The plaintiffs' economist testified as to four elements of damage: lost household services, lost love and affection, lost guidance and counsel, and lost earnings. He testified that the most concrete of the damages, the lost earnings, were $770,000. Under the method suggested in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (en banc), *cert. denied, sub nom. St. Paul Fire & Marine Ins. Co. v. Culver*, —— U.S. ——, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984), and used by the economist here, the present discounted value of Reese's earnings is only $514,000. This figure is calculated by using a three percent discount rate, estimating that Reese's $26,000 [1] annual income would increase at the national average of one and one-half percent per year for the twenty-four years remaining in Reese's working life, *and subtracting nothing for income taxes or Reese's personal living expenses.* We are unable to determine the income tax adjustment the economist actually made, but if Reese's annual income is reduced by a reasonable percentage for income taxes of fifteen percent, the personal living allowance of $5000 suggested in the economist's testimony is deducted, and the economist's estimated fringe benefit of fifteen percent of Reese's salary is added, the present discounted value of Reese's earnings is approximately $418,000. The figure the economist supplied for the present value of Reese's lifetime earnings therefore is mystifying—by about $350,000.

To break out the non-economic losses represented in the jury award, we will assume that Reese provided ten hours of household services per week, and that the jury agreed with the economist's suggested figures for lost earnings and lost household services; we are then left with non-economic damages of $2,166,000 for the family for loss of love and affection, guidance and counsel.

The support in the record for this extravagant award for intangible losses, besides the witnesses' praise for Reese's character, again came from the economist. I am astonished by his testimony—naively so, I suppose. He testified that one could estimate the loss of love and affection by noting the benefits provided by love and affection and by using the hourly rate for services that would provide similar benefits. He testified that the average earnings of clergy, psychiatrists, social workers and counselors produced a rate of $9.50 per hour when averaged together. One hour of these services per day for the rest of Reese's life, when valued at this rate and adjusted for inflation, would produce a present value of $128,000 discounted over Reese's lifetime. Using a similar method, he testified that the value of one hour of guidance and counsel per day until their maturity would be $104,000 for Carolyn Reese and $183,000 for Jennifer Reese.

Stay with me. We are only beginning. The economist then testified that the value of sixteen hours per day of Reese's love and affection every day for the rest of his life would be about $2 million for each of the individual survivors, except in the case of Eli Reese, who had a shorter life expectancy. This figure simply represents one hour's value multiplied by sixteen hours per day discounted over the rest of Reese's life. Since the economist seems to have noticed that Reese would need eight hours sleep a day in order to have the energy to provide sixteen hours of professional quality love and affection to four people every

1. The economist testified that Reese's $25,000 income at the date of his death would have increased to $26,000 by the next year.

day for thirty-six years, I suggest that the economist has overlooked the fact that in any one day Reese lived only twenty-four hours. The economist somehow figured that, within the sixteen hours of providing love and affection at a rate based on professional salaries, Reese could have squeezed in eight hours of work to justify the loss of earnings award. Fitting the damages into an ordinary day gets even tighter, however, when the economist must squeeze into the sixteen hours of work per day, another ten hours per week of household services and another hour per day of guidance and counsel—thirty-four-and-one-half hours stuffed into our twenty-four-hour day.

This circuit has already questioned this type of "unit of time" testimony to establish other intangible, non-economic damages such as pain and suffering. *Westbrook*, 754 F.2d at 1239–40. I must note, however, that the district court suitably cautioned the jury that love and affection were not susceptible to precise measurement. Even with such an instruction, this sort of testimony should be highly suspect as a basis for the damages awarded here.[2] When the suspect nature of the "unit of time" testimony for intangible damages is coupled with the internal incoherence of the economist's testimony, there is little doubt that the damages here are insupportable.

We proceed further. The economist's testimony assumed that somehow Reese would provide sixteen hours of love and affection every day simultaneously for thirty-six years to his wife and two daughters, and to his father for the rest of his father's life expectancy. Since the testimony is based upon the economic hypothesis that Reese's time was worth the same amount as a professional would receive to provide the same benefits, one must assume that the economist's testimony supposed that all four family members would be in the same place every day for sixteen hours where, as in the case of the paid professional, they could simultaneously benefit from his presence. This implicit assumption is bizarre. Eli Reese already lives separately, and Reese's daughters, before thirty-six years have passed, will most likely leave home, not to mention that Reese must work, sleep and perform normal chores.

Let me try to make some sense of this hypothesis if the majority insists on accepting it as a basis for recovery for non-economic losses. Assuming, though in fact it would hardly be the case, that Reese had eight hours a day to give to his family as a whole for every day that remained in his life, the loss of love and affection at $128,-000 per hour (present value of one hour each day for the rest of his lifetime) would be slightly more than $1 million, not the $2 million remaining in the non-economic portion of the award. Subtracting the economist's suggested amounts for guidance and counsel, we are still left with about $850,-000 unaccounted for.

This evidence cannot justify $3 million for the family, even under its own highly dubious terms. Nor can any other evidence. Undoubtedly, Wade Reese was a fine man. Three million dollars will not replace him; $300 million would not replace him. Despite the Reese family's undeniable loss, this award far surpasses the maximum recovery that should be allowed on these facts, and it is "entirely disproportionate to the injury ... so large as to 'shock the judicial conscience,' so exaggerated as to indicate 'bias, passion, prejudice, corruption or other improper motive.'" *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983) (footnotes omitted).

### CONCLUSION

I respectfully submit that if we truly believe that the federal courts are a forum where litigants may expect impartial, objective, fair and just proceedings, this case must be reversed. Although the trial judge who conducted this case is a judge with the highest reputation for integrity

---

**2.** The *Westbrook* court noted that a "unit of time" argument was not reversible error *per se*, but also concluded that it helped establish that the damages were excessive.

and hard work, his comments in this case created an atmosphere that severly and unfairly prejudiced the defendants. The trial that they experienced was anything but impartial.

Furthermore, the arguments of plaintiffs' counsel were irrelevant, demagogic and inflammatory. This trial was a failure in the quest for a truthful and fair verdict. The verdict is the final proof that the conduct of this trial resulted in inexcusable prejudice to the defendant.

How the majority can let this verdict stand, a verdict that awards in excess of $2 million for non-economic losses, I cannot understand. Because I cannot understand, I respectfully dissent.